**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **AVIS FOX** | |
| *Plaintiff,* | **Case No. 8:21-cv-01972-PWG** |
| **v.** | |
| **STATEBRIDGE COMPANY, LLC** | |
| *Defendant* | |

## THIRD AMENDED COMPLAINT AND JURY DEMAND

### I.      INTRODUCTION

1.      Plaintiff Avis Fox ("Mrs. Fox") brings this Third Amended Complaint against Defendant Statebridge Company LLC ("Statebridge") and alleges breach of contract, fraud, negligence, negligent misrepresentation, and violations of the Maryland Consumer Protection Act and Maryland Mortgage Fraud Protection Act.

2.      One foreclosure is a tragedy, a million foreclosures is a statistic. The fraudulent, unfair, and abusive mortgage lending and servicing practices which led to the Great Recession and resulted in millions of Americans losing their homes are numerous and well-documented. Over the last decade, they have been the subject of academic research papers, congressional investigations, books, and even Oscar-nominated movies. But over the last few years, the topic has fallen out of the national consciousness even as the fraudulent, unfair, and abusive practices have continued. This case is about Mrs. Fox's efforts to avoid tragedy and become a statistic.

1

3.      In July and August 2018, Mrs. Fox, who was fifty-seven years old, missed her mortgage payments on her family home occupied by her disabled adult daughter, son-in-law, and their four minor children. Being a responsible individual, Mrs. Fox called her mortgage servicer Statebridge to request a repayment plan under which she would make up the missed payments by paying an additional sum along with her regular mortgage payment over the next few months. All Statebridge had to do was to say yes, which it was contractually obligated to do, and Mrs. Fox and her family would have caught up on their payments and moved on with their lives. Instead, Statebridge failed to review or place Mrs. Fox into a repayment plan, failed to review her for a loan modification for which she was eligible, and then offered a trial period plan which consisted of inaccurate and nonsensical numbers that no responsible person would have accepted. Because of Statebridge's unfair, abusive, and deceptive practices, Mrs. Fox and her family face the tragedy of losing their family home and the prospect of being just another statistic.

## II.      JURISDICTION

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 12 U.S.C. § 2614, 15 U.S.C. § 1691e(f), and 28 U.S.C. § 1367.

## III.      PARTIES

5.      Plaintiff Avis Fox ("Mrs. Fox") is a natural person who resides at 15580 Peach Walker Drive, Bowie, MD 20716. She owns the property located at 6102 Jost Street, Capitol Heights, MD 20743 (the " Property"). The Property is encumbered by a promissory note (Ex. 1) and deed of trust (Ex. 2) dated November 14, 2007 (collectively the "Loan").

6.      Defendant Statebridge Company LLC is a Colorado limited liability company with its principal place of business located at 6061 South Willow Drive, Suite 300, Greenwood Village, Colorado 80111. Statebridge maintains a "Mortgage Lender License" and is registered as a foreign

limited liability company in the State of Maryland. Statebridge is a mortgage servicer which bills itself as providing "Custom, high tough special servicing, and sub servicing for the mortgage industry." Statebridge was responsible for servicing the Loan until October 31, 2019.

7.　　As a mortgage servicer, Statebridge is responsible for the day-to-day management of a mortgage loan, including collecting payments from borrowers, holding funds in escrow accounts for insurance and tax purposes, remitting such escrow funds, interacting with borrowers, and administering the mortgage foreclosure process. Statebridge is also responsible for overseeing and implementing loss mitigation opportunities for borrowers to avoid loan delinquency and foreclosure.

8.　　At all times relevant to this action, Statebridge was acting as the agent of Freddie Mac and within the scope of its duties.

9.　　In the alternative, Statebridge was in privity of contract with Mrs. Fox if it purchased or was assigned the servicing rights under Mrs. Fox's promissory note and deed of trust.

## IV.　FACTS

**Background on Loan Servicing, Loan Modifications and Freddie Mac Loan Servicing Guide**

10.　　Federal Home Loan Mortgage Corporation is a Government Sponsored Enterprise (GSE). Specifically, it is a congressionally chartered[1], privately owned Virginia corporation with its executive offices located at 8200 Jones Branch Drive, McLean, VA 22102. However, the government took over both Freddie Mac and Fannie Mae by putting them under conservatorship in September 2008, during the time which has become known as the Great Recession. According

---

[1] Congress created Freddie Mac in 1970 to compete with its "big sister" Fannie Mae. The Treasury Department provided Freddie Mac with a $2 billion line of credit.

to Statebridge, Freddie Mac is the owner of the Loan. Upon information and belief, Freddie Mac purchased the Loan from the Loan originator.

11.     Freddie Mac is one of two government-sponsored entities created by Congress to provide liquidity in the housing market by purchasing and investing in mortgage loans. Freddie Mac buys mortgages from lending institutions and then either holds them in investment portfolios or resells them as mortgage-based securities to investors.

12.     Freddie Mac does not service the loans it owns or for which it is the investor. Instead, it sells the servicing rights to mortgage servicers such as Statebridge. The servicers collect a percentage of the payments as a fee for the servicing of the loan ("Servicer Fee"). In addition to the Servicing Fee, Statebridge and other servicers receive additional compensation through late and other ancillary fees.[2]

13.     Freddie Mac has a multi-volume industry publication called the Single-Family Seller/Servicing Guide (the "Servicing Guide") which servicers are contractually obligated to follow when servicing loans on behalf of Freddie Mac. The Servicing Guide contains detailed requirements for servicers to follow for all aspects of mortgage servicing. Of particular relevance for this litigation is the Servicing Guide requirements as they relate to loss mitigation and workout policies to avoid foreclosure when a borrower defaults, or is at the risk of imminent default, such as options including re-instatement, repayment plans, and loan modification.

14.     The Servicing Guide states:

Freddie Mac wants the Servicer to pursue alternatives to foreclosure whenever possible, because they benefit not only the Borrower, but also the Servicer, Freddie Mac and other interested parties in the Mortgage by:

1.     Eliminating the staff time and expense the Servicer incurs to service a delinquent Mortgage or a Mortgage in foreclosure

---

[2] *Freddie Mac Single-Family Seller/Servicer Guide* § 9202.2, Late Charges (eff. 03/02/2016)

2.     Reinstating the servicing fee income the Servicer earns if a Mortgage Delinquency is cured, or reinstating part or all of the servicing fee income if a Mortgage is modified

3.     Improving the Servicer's relationship with the Borrower

4.     Minimizing Freddie Mac's credit losses

5.     Reducing an MI or guarantor's claim payment, when applicable
   Even after the Servicer has initiated foreclosure, it should still pursue alternatives to foreclosure to mitigate potential credit losses, whenever possible.[3]

15.     The Servicing Guide contains a hierarchical ranking for the loss mitigation options in a specific order. The ranking begins with repayment and forbearance plans, moves down to a modification, and concludes with property disposition options such as a short sale and deed in lieu of foreclosure. When evaluating a borrower for loss mitigation, the servicer must follow the sequence of options until reaching one for which the borrower is eligible and that is appropriate based on the borrower's circumstances. The hierarchy requires that the servicer first consider options designed to meet temporary hardships, then move on if necessary to options appropriate for permanent hardships.

16.     Servicers are eligible for compensation for completing certain alternatives to foreclosure. For example, a servicer may receive $500 for a repayment plan, up to $1,600 for a loan modification depending on the length of delinquency, $1,500 for a deed in lieu, and $2,200 for a short sale.[4] It is important to note that a servicer can only receive compensation for a Repayment Plan if the mortgage was 60 or more days delinquent at the time the borrower enters the repayment plan.[5]

---

[3] *Freddie Mac Single-Family Seller/Servicer Guide* § 9201.1, Rationale for Servicer Loss Mitigation Activities (eff. 03/02/2016)

[4] *Id.* § 9204.6, Servicer Compensation for Alternatives to Foreclosure (eff. 10/01/2017).

[5] *Id.*

17.     Servicers are required to pursue reinstatement as the first option for resolving a delinquency.[6] A reinstatement occurs when a borrower pays all delinquent mortgage payments and past-due amounts, making the mortgage current.[7] A borrower may reinstate a delinquent mortgage at any time, even after foreclosure proceedings begin or while a relief or workout plan is in progress. In general, the servicer doesn't need to seek Freddie Mac's approval to process a reinstatement. However, the servicer must follow Freddie Mac guidelines that do not give the servicer the discretion to reject a reinstatement if the borrower meets the terms outlined by the company in the Servicing Guide.[8]

18.     A reinstatement may be full or partial. Relevant for this litigation is a partial reinstatement.

19.     In a partial reinstatement, the borrower referred to foreclosure pays an amount less than the total due, including advances, legal fees, and expenses (except accrued late charges), executes a repayment plan for the remainder, and pays the first payment due under the repayment agreement. The agreement must be in writing if the repayment plan exceeds three months. The repayment period may last up to twelve months if there is an escrow account on the mortgage. If there is no escrow account the servicer must establish one, if the repayment period exceeds three months, and then may extend the repayment period up to eighteen months without Freddie Mac's approval. The borrower completely reinstates the mortgage when they pay all of the payments specified in the repayment plan.[9]

---

[6] *Id.* § 9201.2, Freddie Mac Loss Mitigation Evaluation Hierarchy (eff. Oct. 1, 2017).
[7] *Id.* § 9203.1, Reinstatements and Relief Options (eff. Mar. 2, 2016).
[8] *Freddie Mac Single-Family Seller/Servicer Guide* § 9203.4 (eff. Mar. 2, 2016), § 9203.5, When to Accept Partial Reinstatement of a Mortgage in Foreclosure (eff. Mar. 2, 2016).
[9] *Id.* § 9203.5.

20.     A servicer may also offer to a borrower a repayment plan which is defined as "an agreement between the Servicer and a borrower that gives the borrower a defined period of time to reinstate the Mortgage by paying normal regular payments plus an additional agreed upon amount in repayment of the Delinquency."[10]

21.     If the monthly repayment plan payment does not exceed 150% of the contractual mortgage payment including taxes and insurance, the mortgage is less than 90 days delinquent, and the repayment plan terms does not exceed six months in length, then a Borrower Response Package ("BRP")[11] is not required.[12]

22.     If a borrower is not eligible, does not accept, or does not complete a reinstatement plan, a servicer should review a borrower for other loss mitigation options including loan modification, short-sell, or deed in lieu.

23.     No later than 45 days after a missed payment, a Servicer must send at least one Borrower Solicitation Package or solicitation letter to the borrower with information, including but not limited to, the availability of alternatives to foreclosure as set forth in Section 9102.5(b).[13]

24.     A loan modification is a written agreement between the servicer and the homeowner to change one or more of the original terms of the note to ease the homeowner's financial burden and, typically, to bring the loan current. Modifications may involve reducing the interest rate, changing from an adjustable rate to a fixed rate, extending the loan term, capitalizing

---

[10] *Id*. §9203.8, What is a Repayment Plan? (eff. Mar. 2, 2016).
[11] A Borrower Response Package consists of documents including, but not limited to an application, hardship letter, tax forms and other documents necessary for a servicer to determine a borrower's eligibility for a loan modification. Id. § 9102.5; § 9202.3
[12] *Id*. § 9203.10, Servicer Approval Authority for Repayment Plans (eff. Oct. 19, 2017).
[13] *Id.* §9102.5(a)(i), Borrower Solicitation and Communication (eff. Jun. 1, 2018).

delinquent payments, and forbearing or forgiving principal or arrears. The modification can be short-term (less than two years), long-term (two to five years) or for the life of the loan.

25.     In December 2016, Freddie Mac announced the contours of the Flex Modification and required that all servicers implement it by October 2017.

26.     The Flex Modification provides a modification with uniform terms and with limited reliance on individual borrower financial information. The Flex Modification calculates the modification terms with information from the servicer's records and does not rely on information from the borrower, such as income. Borrowers can obtain a Flex Modification in either of two ways: they can apply for the modification through an application know as a BRP, or they can accept a modification offer given unilaterally by a servicer without consideration of an application.[14]

27.     A borrower is eligible to be considered for a Flex Modification when the loan is at least sixty days delinquent.[15] In addition, a borrower who is current or less than sixty days delinquent can be reviewed for a Flex Modification if the borrower meets the "imminent default" standard defined by the Freddie Mac.[16]

28.     The servicer must use the Freddie Mac Workout Prospector to evaluate borrowers for Trial Period Plans and modification.[17] The Workout Prospector is a web-based application that gives servicers the ability to analyze, structure, and send alternative for foreclosure recommendations to Freddie Mac electronically. Servicers input different variables into the Work

---

[14] *Id.* § 9206.5, Eligibility Requirements for a Freddie Mac Standard Modification (eff. Jul. 1, 2018).
[15] *Id.*; *Id.*, at D2-3.2-07, Fannie Mae Flex Modification.
[16] *Id.* , at D2-1-01, Determining If the Borrower's Mortgage Payment Is in Imminent Default; *Id.* § 9206.7, Determining Imminent Default for a Freddie Mac Flex Modification (eff. Jul. 1, 2018).
[17] Id. § 9206.10 (c)

Prospector to determine a borrower's eligibility and calculate payment terms for a modification or other workout option.

29.     When a servicer reviews a borrower for a Flex Modification after receipt of a BRP it relies primarily on information from its own records. This includes any property valuation estimate it has obtained. The servicer must evaluate a completed BRP within 30 days of receipt and must send the borrower a Borrower Evaluation Notice indicating the outcome of the decision.[18]

30.     Similarly, "When a Borrower becomes 90 days delinquent … the Servicer must determine if the Borrower is eligible for a streamlined offer for a Flex Modification in accordance with Section 9206.5(c) and, if eligible, solicit the Borrower for such modification. The Servicer must send an initial …   Streamlined Modification Solicitation Letter, and a Streamlined Modification Trial Period Plan Notice… on or before the 105th day of Delinquency to a Borrower who becomes 90 days delinquent and is otherwise eligible."[19] A Streamlined Flex Modification does not require the submission of a BRP, and the servicer is not required to confirm a borrower's hardship or income.[20]

31.     A basic Flex Modification evaluation waterfall applies to all applications submitted after ninety days of delinquency and in all instances when a servicer reviews a borrower for a Flex Modification without considering information supplied by a borrower as part of an application. The basic waterfall consists of five steps.[21] None of the basic steps considers income or other information provided by a borrower.

---

[18] *Id.* § 9206.11 (eff. June 13, 2018).
[19] *Id.* §9102.5 (a)(ii), Borrower Solicitation and Communication (eff. Jun. 1, 2018).
[20] *Id.* § 9206.5 (c) (eff. Jul. 1, 2018) ("[For Borrowers who are 90 days delinquent or greater], the eligibility requirements in Section 9206.5(a) are not applicable. In these instances, a Borrower Response Package is not required, and the Servicer is not required to confirm a Borrower's hardship or income.").
[21] *Id.* § 9206.10, Determining the terms of a Freddie Mac Flex Modification (eff.  July 1, 2018).

32.     A borrower who is evaluated and determined eligible for a Freddie Mac Flex Modification must enter into a trial period plan ("TPP") under which the borrower will be required to remit three monthly payments at an estimated modified payment amount which must include principal, interest, taxes, and insurance.[22] The servicer must determine that the estimated monthly modified P&I payment calculated when determining whether the terms of the trial period plan would comply with applicable P&I payment reductions set forth in Sections 9206.5 and 9206.10 for the permanent modification.[23]

33.     If the servicer determines that the borrower is eligible for a Flex Modification (whether based on an application or on the servicer's proactive evaluation), the servicer must send the borrower an offer to enter into the TPP through by use of the Standard Modification Trial Period Plan Notice, after amending, as necessary, to conform to the Flex Modification program Terms.[24]

34.     Freddie Mac publishes a *Workout Prospector Users' Guide* to aid servicers compliance with the Servicing Guide.

35.     When calculating a borrowers projected payments for a modification and TPP, the *Workout Prospector Users' Guide* requires the servicer to input the borrower's "Projected Escrow Shortage" in the appropriate field.[25] The Projected Escrow Shortage is the amounts that will come due once the loan has been modified and would cause the balance to drop below the targeted escrow balance. "The borrower may remit the shortage over a period of at least 12, but no more than 60 months. The borrower may also remit the shortage amount in a lump sum payment."[26]

---

[22] *Id.* § 9102.5.; *Id.* § 9206.11 (eff. June 13, 2018).
[23] *Id.*, § 9206.10(b) (eff. Jul. 1, 2018).
[24] *Id.*
[25] *Workout Prospector Users' Guide*, May 2019, at 3-16:3-17
[26] *Id.*

36.     The servicer should only complete the Projected Escrow Shortage field when calculating the payment when the borrower elects to pay the shortage over a 60-month period, or the borrower's intent is unknown, in which case, the servicer should assume the shortage will be spread out over 60 months.[27]

37.     If the borrower successfully completes the TPP, the servicer must provide the borrower with a permanent loan modification agreement.

### The Mortgage Industry's Deplorable Record with Regard to Loss Mitigation Has Harmed Countless Consumers

38.     Since 2008, mortgage servicers across the board have harmed consumers by failing to properly conduct loss mitigation including with respect to loan modifications:

> Loan Servicers "have failed to allocate resources to hiring, training, and supporting a sufficient number of competent employees to process loss mitigation applications in a timely, efficient manner and abide by the specific investor guidelines. Instead, servicers engage in careless and abusive loan servicing practices such as misrepresenting the status of loan modification applications to homeowners, issuing inaccurate denials of modifications, repeatedly demanding documents and information already produced, misplacing confidential information, and failing to provide timely responses regarding the application process and eligibility for all loss mitigation options.

Andrea Bopp Stark (FN1), *A DUTY TO REEVALUATE A DUTY OF CARE FOR MORTGAGE SERVICERS*, 30 Me. B.J. 77, 78 (2015)

39.     In 2012, 49 states entered into a $26 billion National Mortgage Settlement ("NMS") with the five largest mortgage servicers: Chase, Wells Fargo, GMAC, Citi, and Bank of America for allegations of unfair and deceptive servicer misconduct including prevalent misconduct in the loan modification process.

40.     In 2014, the CFPB implemented Regulation X, which contains provisions governing loss mitigation procedures and protections ("mortgage servicing rules").

---

[27] *Id.*

11

41.     Unfortunately, since the settlement and the implementation of the rules, mortgage servicers have continued to engage in misconduct with many of the servicers receiving sanctions from the OCC or entering consent orders with state and federal regulators.  For example,

a.      In June 2017, mortgage servicer Fay Servicing LLC ("FAY") entered a consent order with the Consumer Financial Protection Bureau ("CFPB") after the CFPB found that FAY was violating the mortgage servicing rules in a host of different ways including failing to timely send notices and evaluate borrowers for loss mitigation options.[28]

b.      In May 2020, mortgage servicer Specialized Loan Servicing, LLC ("SLS") entered a consent order with the Consumer Financial Protection Bureau ("CFPB") after the CFPB found that SLS was violating federal regulations regarding loss mitigation by attempting to foreclosure before completing a proper review of a loss mitigation application. [29]

c.      In 2021, Wells Fargo entered a Consent Order with the Office of the Comptroller of Currency ("OCC") and was assessed a $250,000,000.00 fine for "(1) unsafe or unsound practice(s) related to material deficiencies regarding the Bank's loss mitigation activities, including loan modification decisions and operational practices, and inadequate Independent Risk Management and Internal Audit of the Bank's loss mitigation activities…"[30]

---

[28] https://files.consumerfinance.gov/f/documents/062017_cfpb_Fay_Servicing-consent_order.pdf
[29] https://files.consumerfinance.gov/f/documents/cfpb_specialized-loan-servicing_consent-order_2020-05.pdf
[30] https://www.occ.gov/static/enforcement-actions/ea2021-036.pdf

**Servicers can benefit financial from delaying or denying repayment plans and loan modifications to borrowers**

42.     Perverse incentives fundamental to the servicing industry's compensation structure mean that loan servicers can benefit financially by delaying or denying repayment plans and modifications. Broadly speaking, servicers can benefit in the following often overlapping ways: (1) charging additional ancillary fees (such as late fees) or foreclosure expenses; (2) purchasing and selling REO properties after foreclosure; (3) increasing servicing fees by increasing the modified principal balance; (4) saving money by not maintain functional loss mitigation departments; and (5) receiving higher incentives for avoiding foreclosure.

43.     First, servicers can generate additional profit by charging additional late and other ancillary fees to homeowners who are in default. The longer the borrower stays in default, the greater amount of fees the servicer can charge. These fees can be recovered if the borrower becomes current, the fees are capitalized into principal balance when the loan is modified, or the home is sold at foreclosure.

44.     Second, a servicer may repurchase a loan from Freddie Mac upon request either before or after foreclosure sale (a property repurchased by Freddie Mac at foreclosure sale is referred to as an "REO" property).[31] "Generally, Freddie Mac will only allow the Servicer to repurchase a mortgage that is 90 or more days delinquent, or in foreclosure."[32] Statebridge maintains a REO property section on its webpage in which it advertises the sale of REO properties.[33] Upon information and belief, Statebridge can sell REO properties at a profit.

45.     Third, because a servicer's compensation is a percentage of the principal and interest payment each month, a mortgage servicer can increase its future profits by implementing

---

[31] *Id.,* § 3602.4, 3502.5, § 8303.14 (eff. 08/17/16)

[32] *Id.,* § 8303.14

[33] https://www.statebridgecompany.com/reo-homes/ (last visited December 5, 2022)

a modification in which a larger number of arrearages are capitalized into the unpaid principal. The easiest way to increase the modified principal amount is to delay a modification so that more payments (including escrow), costs, and fees have to be capitalized. That greater amount is then amortized over the life of the loan, and the servicers' fee is increased or extended for the servicing of the same loan.

46.     Fourth, servicers are required to provide loss mitigation services to borrowers as part of their standard servicing duties for which they receive their servicing fees. Any money spent on staffing or technology related to the loss mitigation department means less profit for the servicer. However, servicers are allowed to recover for foreclosure related services and expenses including for services provided by the servicer's employees, and the costs for work that is outsourced to third parties. Thus, servicers are incentivized to spend less on loss mitigation and push more loans to foreclosure.

47.     Fifth, under the Servicing Guide, a servicer may receive a higher incentive award by delaying or denying one option in favor of a more lucrative option.

**Background of the Loan and Property**

48.     Mrs. Fox purchased the Property in or around 1993 through the use of a housing program for low-moderate income families. Mrs. Fox had to work two jobs to take advantage of the opportunity to become a first-time homeowner.

49.     On or around November 14, 2007, Mrs. Fox and her now-deceased husband Henry Fox refinanced the Property by executing the Note and Deed of Trust for a principal amount of $170,000.00 from Washington Mutual Bank, FA (not a party to this litigation). *See* Exs. 1, 2. Mr. Fox died on April 17, 2008. Mrs. Fox is the sole owner of the Property.

50.     At the time of the refinance, Mr. and Mrs. Fox's daughter was living in the Property and was responsible for covering the mortgage payment. Mr. and Mrs. Fox were not making any

profit from their daughter living in the Property, and there was no formal rental agreement. Mr. and Mrs. Fox disclosed this information to the loan officer at the time of the loan origination. The loan officer directed Mr. and Mrs. Fox to execute a rental agreement to evidence the arrangement to secure the loan. In compliance, Mr. and Mrs. Fox and their daughter executed a two-page rental agreement to memorialize the arrangement, and submitted the agreement to the loan officer.

51.     The purpose of the refinance was to take cash out of the Property to pay off personal debts, purchase used cars for Mr. and Mrs. Fox, and repair their home.

52.     The Deed of Trust is a Maryland – Single Family – Fannie Mae/Freddie Mac Uniform Instrument. The Deed of Trust defines the applicable law as "all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. 2, DOT, DOT DEFINITIONS (I). Section 20 of the Deed of Trust states: "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law." Ex. 2, ¶ 20.

53.     Pursuant to the Real Estate Settlement Procedures Act ("RESPA") and its enforcing regulation, Regulation X, 12 C.F.R. § 1024.01 *et seq.*, a servicer must maintain policies and procedures that are reasonably designed to provide timely and accurate information to borrowers, and properly evaluate loss mitigation applications. 12 C.F.R. § 1024.38(b)(1)-(2).

54.     At some point prior to July 2018, the promissory note and deed of trust were purportedly negotiated or transferred to Freddie Mac who asserts that it remains the owner or investor of the Loan.

55.     The servicing rights and obligations of the Loan were transferred, assigned, or sold to Statebridge. Statebridge took assignment of the servicing obligations in borrowers' loan agreements, and/or is in functional privity and near privity of contract with Mrs. Fox, tasked with performing many of the obligations assumed by the Lender to Mrs. Fox's Loan agreement.

**Statebridge Violates Freddie Mac Loan Servicing Guide by Failing to Offer Mrs. Fox a Repayment Plan and Streamlined Modification**

56.     In the summer of 2018, Mrs. Fox's daughter, son-in-law, and four grandchildren were living in the Property and paying the mortgage monthly mortgage payment. Mrs. Fox was not making any monthly profit from the arrangement and the market rate rental value of the Property was significantly higher than the mortgage payment, but Mrs. Fox would do anything for her family. In addition, Mrs. Fox often had to pay the whole mortgage payment herself.

57.     In or around July 2018, Mrs. Fox's daughter was on disability as she was suffering from various mental health issues, and her son-in-law had exhausted all of his leave from work caring for her. Because of this, they were not going to be able to make the July mortgage payment on time. Mrs. Fox and her family would be able to resume making payments in the near future as her daughter's family was waiting for a thrift-savings loan to fund expenses, and Mrs. Fox could make the payments on her own, if necessary, with advance notice. As such, the July 1, 2018 mortgage payment was not submitted on time.

58.     As of July 1, 2018, the full mortgage payment consisting of principal, interest, taxes and insurance (principal and interest payments will be referred to as "P&I" while taxes and

insurance will be referred to as "T&I" or "escrow payment") was $1,289.36 including P&I of $812.37 and T&I of $476.99.

59.     As the due date of the missed payment was July 1, 2018, pursuant to the Servicing Guide, Statebridge was required to send Mrs. Fox a Borrower Solicitation Package or solicitation letter with information, including but not limited to, the availability of alternatives to foreclosure as set forth in Section 9102.5(b), by August 15, 2018. In addition, it was required to evaluate her for a Flex Modification by September 29, 2018, and if eligible, send her an initial Streamlined Modification Solicitation Letter, and a Streamlined Modification Trial Period Plan notice on or before October 14, 2018. Neither of which it did.

60.     In August 2018, Mrs. Fox's monthly mortgage payment was increased to $1,332.45 consisting of P&I of $812.36 and T&I of $520.08.

61.     Mrs. Fox failed to submit the August 1, 2018 payment as well. As of the August 2018 statement, the unpaid principal balance was $185,258.73, and the total amount due was $2,702.41.

62.     In or around August 2018, Mrs. Fox contacted Statebridge to request loss mitigation assistance in the form of a repayment plan in which she could make up the missed payments by paying extra with her usual payments over the following months. Mrs. Fox spoke with "Ramano/Ricardo" and explained the situation to him, including that it was her adult daughter and her family living in the Property, and requested assistance.

63.     Rather than informing Mrs. Fox of the existence of the repayment plan, reviewing her loan for eligibility for the repayment plan, or placing Mrs. Fox's Loan into a repayment plan as allowed pursuant to the Servicing Guide, the Statebridge representative told Mrs. Fox that she had to submit a BRP to be reviewed for a loan modification. This statement was false, inaccurate,

or incomplete as at the time, Mrs. Fox was eligible for a repayment plan without submitting a BRP, and was not eligible for a loan modification because she was not more than 60 days delinquent. At the time Statebridge's representative made the misrepresentations or omissions, Statebridge knew these representations were false.

64.     As of August 2018, Mrs. Fox owed $2,702.41 in arrears. If that amount was spread out over six months in a repayment plan, Mrs. Fox's payment for those months would have been increased by $436.97 making the total payment $1,782.85, or less than 150% of the original payment. As such, Mrs. Fox was not required to submit a BRP to receive a repayment plan, and Statebridge was not required to receive Freddie Mac's consent before entering the agreement.[34]

65.     Statebridge's failure to place Mrs. Fox into a repayment plan prevented Mrs. Fox from becoming current, and caused her to fall deeper into default by missing more payments. By missing additional payments, Mrs. Fox lost the ability to reinstate her Loan by repayment because each missed payment increased the amount she had to repay, quickly rising over the 150% payment cap. Thus, the only method remaining to reasonably save her home would be a loan modification. While more desirable than foreclosure, a loan modification would result in additional interest payments over the life of the loan because the past due amount would be capitalized. But as explained below, Statebridge also unfairly, abusively, and deceptively robbed Mrs. Fox of that opportunity as well. In addition, Statebridge's failure to place Mrs. Fox into a repayment plan prevented her from being current at the time that the COVID-19 pandemic begun which would have provided her with additional rights and protections as discussed below.

---

[34] *Servicing Guide, § 9203.10(2)*

66.     At the time Mrs. Fox requested a repayment plan, she was less than 60 days delinquent and thus, Statebridge would not have received the repayment plan incentive from Freddie Mac.[35]

67.     If Statebridge had complied with the Service Guide, this situation would have been resolved to the benefit of all of the parties involved. Instead, Statebridge continued committing costly servicing errors and making material misrepresentations and omissions to the detriment of Mrs. Fox, her family, the owner of the Loan, and the American taxpayer.

68.     Relying upon Statebridge's direction that she had to complete a BRP before she could be reviewed for any loss mitigation assistance, Mrs. Fox immediately completed the BRP and sent it to Statebridge. Pursuant to the Servicing Guide, Statebridge was required to acknowledge receipt of BRP within 5 days and review it to determine if any documents were missing, and evaluate her for all potential loss mitigation options and inform her of its decision within 30 days, but Mrs. Fox never received such an acknowledgement and her BRP was never evaluated.[36] Statebridge would later claim that it never received the BRP in the mail, an excuse that Statebridge would use more than once with Mrs. Fox and apparently other borrowers.

69.     While she had the ability to resume making payments with the repayment plan, Mrs. Fox waited to make any payments because she understood that she needed to submit the BRP and have it reviewed before making additional payments.

70.     In September 2018, Mrs. Fox contacted Statebridge for an update on the submitted BRP and to discuss a letter she had received from the law firm of Stern & Eisenberg threatening to foreclose. The letter stated that if Mrs. Fox did not submit the past due amount with 35 days,

---

[35] *Id.* § 9204.6, Servicer Compensation for Alternatives to Foreclosure (eff. 10/01/2017).
[36] *See Id.* § 9206.11 (eff. June 13, 2018).

that they would move forward with the foreclosure and public sale of the Property. Ex. 3, 20180919 Stern & Eisenberg Debt Collection Letter. Mrs. Fox spoke with a Statebridge representative named "Jackie." Mrs. Fox asked Jackie "what was going on?" and jokingly said to her, "my late husband is turning over in his grave; you are trying to put his children and grandchildren out on the streets." Jackie laughed and said, "Mrs. Fox you are fine and no one is taking your home and someone will get back with you." However, Mrs. Fox never heard from Jackie or anyone else from Statebridge.

71.     On September 29, 2018, the 90th day of delinquency, Statebridge was required to evaluate Mrs. Fox for a Streamlined Flex Modification without requiring her to submit a BRP, and if eligible, send her an initial Streamlined Modification Solicitation Letter, and a Streamlined Modification Trial Period Plan notice on or before October 14, 2018.[37] Statebridge failed to comply with this requirement of the Servicing Guide.

72.     If Statebridge had properly evaluated her for the Streamlined Flex Modification, Mrs. Fox was eligible for the Streamlined Flex Modification as she met all the requirements found in the Servicing Guide. Ex. 4, Flex Mod Calculator. Specifically, her P&I Payment would have been reduced from $812.37 to $803.64 as required by the Servicing Guide.[38]

73.     As Mrs. Fox was eligible for the Streamlined Flex Modification, Statebridge was required to solicit her for the Streamlined Flex Modification Trial Period Plan, which it never did.

74.     At the time, Mrs. Fox would have accepted the plan and had the ability to resume making the modified payments. If she successfully completed the TPP, then Statebridge would have been required to offer her a permanent modification.

---

[37] *See Id.* § 9206.5(c) (eff. Jul. 1, 2018).
[38] *See Id.* § 9206.5.

75.     If Mrs. Fox's Loan had been modified, it would have been current, and she would have avoided all additional fees, interest, and emotional distress that she has suffered as a result of Statebridge's continued failures and intentional concealment of material facts. In addition, Statebridge's failure to timely evaluate Mrs. Fox for a Streamlined Flex Modification has likely resulted in Mrs. Fox's Loan becoming ineligible for a Flex Loan Modification because, due to the number of missed payments, it is no longer possible to reduce her P&I Payment in accordance with the waterfall in the Servicing Guide. Finally, Mrs. Fox would have been current at the time that the COVID-19 pandemic begun which would have provided her with additional rights as discussed below.

76.     In October 2018, Mrs. Fox contacted Statebridge again and was told that she had to submit a BRP as Statebridge had never received the one she originally sent in the mail. This was despite the fact that Statebridge was required to have evaluated her without a BRP and that Mrs. Fox's Loan qualified. Nevertheless, Mrs. Fox again dutifully complied and sent in the requested documents.

77.      In a letter dated November 9, 2018, Mrs. Fox received a letter from Statebridge stating that she needed to submit "30 days of current pay stubs for October 2018" and "2017 Tax Return signed and dated all pages all schedules" in order to complete her application. The letter stated that Mrs. Fox had to complete and return the requested documents by December 9, 2018 in order to "avoid delays or cancellation of [her] request." Ex. 5, Nov. 9, 2018 Request for Additional Documents Letter.

78.     This request for additional documentation in order to review her for a modification is in violation of the Servicing Guide requiring that "The Servicer must send an eligible Borrower an offer for a Flex Modification in accordance with the requirements of Section 9206.5(c) once

the Borrower reaches the applicable Delinquency threshold if: The Servicer has not received a complete Borrower Response Package…"[39] This unnecessary delay likely resulted in Mrs. Fox becoming ineligible for a Flex Modification.

79.     Nevertheless, Mrs. Fox once again relied on Statebridge's misrepresentations and omissions and submitted the documents to Statebridge.

80.     In December 2018, Mrs. Fox received a debt collection letter from Stern & Eisenberg stating that the total amount of $194,245.97 was due on the Loan.

81.     In December 2018 and January 2019, Mrs. Fox made repeated phone calls to Statebridge to follow up on her BRP submission but was never successful in speaking with a representative.

82.     On February 7, 2019, Mrs. Fox again called Statebridge and spoke with a Statebridge representative who identified herself as "Rebecca." Rebecca informed Mrs. Fox that Statebridge had received her completed BRP on January 24, 2019, and that Mrs. Fox should have been sent a letter saying so. Rebecca emailed Mrs. Fox a letter curiously dated January 24, 2019 which stated "Thank you for your recent application received on 01/24/2019 for loss mitigation assistance. A review of the information received indicates that your package appears to be complete. Statebridge will evaluate your loss mitigation application within 30 days from the date your application was received and provide you a decision." Ex. 6, January 24, 2019 Letter.

83.     On February 27, 2019, Mrs. Fox contacted Statebridge for an update on her application as it had been more than 30 days since Statebridge claimed it had a complete application. Mrs. Fox spoke with Statebridge representative who identified herself as "Andrea." Mrs. Fox requested to speak with her point of contact from the January 24, 2019 Letter, Ms.

---

[39] *Id.* § 9206.5 (c) (eff. Jul. 1, 2018)

Mawson. Andrea told Mrs. Fox that Ms. Mawson was at lunch and would call Mrs. Fox back later. Ms. Mawson never called Mrs. Fox back.

84.    After several weeks, Mrs. Fox sent Ms. Mawson a letter dated March 21, 2019, with a certified return receipt requested. Mrs. Fox never received a response to the letter or the return receipt.

85.    In April 2019, Mrs. Fox contacted the Colorado Post Office to see if Statebridge was receiving her letters. The Postmaster was able to provide Mrs. Fox with most of the electronic receipts for the letters sent to Statebridge showing that they had been delivered even though she never received a response.

### Statebridge Sends Mrs. Fox a TPP Offer which Contained Improper and Nonsensical Terms

86.    On or around May 20, 2019, Mrs. Fox received a letter from Statebridge dated May 1, 2019, but postmarked May 10, 2019. The letter was a Flex Streamlined Modification Trial Plan Notice ("TPP Notice") in which Mrs. Fox was offered the opportunity to enter a TPP. Ex. 7, TPP Notice. According to the letter, Mrs. Fox would pay three trial period plan payments ("TPP Payments") of $1,669.70 and would receive a loan modification with an interest rate of 4.125% fixed for a term of 480 months (while at the time Mrs. Fox was unaware of the capitalized amount used to determine the unpaid principal balance of the proposed modification, she has since learned that it was $198,862.23). Mrs. Fox hoped that she had finally found a resolution to her problems, but there were several issues with the offer.

87.    First, the TPP Notice contained incorrect TPP Payments amounts. According to the Servicing Guide, Mrs. Fox's TPP Payments had to be the "estimated modified payment amount" that would occur in the full modification.[40] An estimated modified payment amount is determined

---

[40] *Id.* § 9206.11.

by capitalizing the arrearages into the unpaid principal balance, determining the interest rate, and extending the term to 480 months.

88.     In the TPP Notice sent to Mrs. Fox, the TPP payments were $1,669.70 including principal, interest, taxes, and insurance. However, the letter did not inform Mrs. Fox how much of the payment was attributed to principal, interest, taxes, and insurance. At the time, Mrs. Fox's current total P&I and T&I payment was $1,332.45, consisting of P&I payments of $812.37 and T&I payments of $520.08.

89.     Unbeknownst to Mrs. Fox until discovery in this action, Statebridge used the Work Prospector to calculate the terms of the TPP and modification offer. Based on the term of 480 months, interest rate of 4.125%, and an unpaid principal balance of $198,862.23, Statebridge calculated that Mrs. Fox modified P&I payment should have been approximately $846.65, and P&I payment $520.08 for a total modified payment of $1,366.73. However, because of the timing of the modification and the due date of certain escrow payments, Statebridge determined that there would be a Projected Escrow Shortage balance of $3,950.64. Statebridge spread that amount over 12 months and calculated an additional payment of $302.97. Statebridge did not inform Mrs. Fox that the TPP included the Projected Escrow Shortage payment nor that amount would only be present for 12 payments rather than the entire life of the loan.

90.     Statebridge's actions violated the Servicing Guide and the Workout Prospector because it was required to contact Mrs. Fox to determine whether she wanted to pay off this amount in a lump sum, or over spread it out over up to a period of 60 months. Without her election, it was required to spread the amount over 60 months for the purposes of calculating the TPP and modification. If it had done so correctly, Mrs. Fox's modified payment for the first 60 months would have been $1,432.58. Mrs. Fox would have accepted this payment.

91.     However, none of this was disclosed to Mrs. Fox and thus, the apparent increase in the P&I payment of the proposed TPP Payment was approximately $337.62 a month for a modified monthly P&I Payment of $1,149.62. If the modified P&I Payment was $1,149.62, Mrs. Fox's Loan would have been paid off in less than 360 months rather than the term of 480 months required by the Servicing Guide and stated in the TPP Notice.

92.     Had Statebridge contacted Mrs. Fox for her election, or properly informed her that the increase in her payment was temporary, she would have accepted the TPP.

93.     The second issue with the TPP Notice was that it was months late and thus, Mrs. Fox was unable to determine the date Statebridge used to determine the modified unpaid principal balance and payment amounts, and whether it was correct.

94.     The third issue with the TPP Notice was that the first payment was due May 1, 2019, which was 9 days before the letter was sent and 19 days before it was received by Mrs. Fox. The TPP Notice stated that Mrs. Fox had to notify Statebridge by May 15, 2019 of her intent to accept the TPP offer in order to stop the foreclosure.

95.     On or around May 30, 2019, Mrs. Fox filed a complaint ("CFPB Complaint") with the Consumer Financial Protection Bureau ("CFPB") regarding Statebridge's conduct. Ex. 8, Initial CFPB Complaint.

96.     On or around June 12, 2019, Mrs. Fox supplemented her CFPB Complaint with additional information including explaining that she had requested a repayment plan in August 2018. Ex. 9, June 12, 2019, CFPB Supplement.

97.     In July 2019, Statebridge responded to the CFPB Complaint by acknowledging that "it does appear that there has been a little difficulty in maintaining communications in this case" and that the complete loss mitigation application was received no later than January 24, 2019, and

that "the approval from the investor did take some time but was approved[,]" and recommended that Mrs. Fox contact a Statebridge representative regarding her modification. Ex. 10, CFPB Response.

98.     Also in July 2019, Mrs. Fox contacted Statebridge as instructed in its response to her Complaint. Mrs. Fox spoke to a Statebridge representative who identified himself as "Richard." Richard told Mrs. Fox that she was in foreclosure and thus had to speak with foreclosure attorney Edison Romero.

99.     In August 2019, Mrs. Fox contacted Mr. Romero who told her that he was not an attorney and that she needed to speak with Latoya Wright. Ms. Wright told Mrs. Fox that she was in foreclosure, but nothing had been filed yet, and that Mrs. Fox should speak with attorney Eric Vandelinee.

100.     Mrs. Fox spoke with Mr. Vandelinee who told her that the foreclosure would be filed within 30 days and that Mrs. Fox needed to speak to Statebridge regarding the modification. This terrified Mrs. Fox as she was going to lose her house.

101.     Mrs. Fox contacted Statebridge once again to discuss the Loan modification offer as Mrs. Fox still could not understand why her monthly payments would go up by such a large amount in a modification. Mrs. Fox spoke with Statebridge representative "Mike." Mrs. Fox asked Mike about the $300 increase in the payment amount and the mortgage being extended to 40 years. Mike, sounding nervous, was unable to answer Mrs. Fox's questions and told Mrs. Fox that she had to speak with "Rashard."

102.     Rashard was arrogant, insulting, and disrespectful when questioned about the modification. Using a tone as if he was chastising a child, Rashard made several false, misleading, and incomplete statements which are unfair, abusive, and deceptive trade practices including:

a.      Not explaining how Statebridge calculated the TPP Payment amounts.

b.      That the modification closed June 24 and the lender was not giving her any more modifications because she had too many of them.

c.      He also wanted to know why Mrs. Fox waited until July 31 to contact Statebridge, but avoided answering why Statebridge did not answer any of Mrs. Fox's calls.

d.      He was also very adamant about the "lender" not giving her another modification.

103.    Rashad did not inform Mrs. Fox that the increase in the monthly payment was temporary based on the Projected Escrow Shortage calculation and that it would have been removed after 12 months.

104.    Following this conversation, Mrs. Fox reached out to Freddie Mac and was told that it was untrue that she could not receive another modification offer.

105.    Mrs. Fox continued to contact Statebridge and also continued making complaints to administrative agencies, elected officials, and other entities to attempt to remedy Statebridge's mistakes.

106.    Also in August 2019, Mrs. Fox received a letter from a law firm named "JAS" who stated it was collecting a debt on behalf of Statebridge.

107.    Statebridge continued to try to collect from Mrs. Fox as if her Loan was still in default including late fees and other charges which were caused solely by Statebridge's actions.

108.    In September 2019, Mrs. Fox received a Notice of Intent to Foreclosure from Stern & Eisenberg.

109.    On or around October 31, 2019, the servicing of Mrs. Fox's Loan was supposedly transferred to Defendant Community Loan Servicing, LLC ("Community").

110.    On December 3, 2019, in response to a complaint by Mrs. Fox to the Maryland Division of Financial Regulation, Statebridge falsely stated in a letter that "Unfortunately, Mrs. Fox's assertion that she wished to make up missed payments in 2-3 installments was not a viable option as she was well over 12 months in delinquency." Ex. 11, Statebridge Response Letter. This assertion is false because Mrs. Fox sought a repayment plan in August 2018 at the time when she was only 2 months delinquent, not when she was 12 months delinquent. The letter also fails to disclose that Mrs. Fox should have been offered a repayment plan, should have been reviewed for a Streamlined Flex Modification 90 to 105 days after the missed July 1, 2018 payment without submitting a BRP, and that she would be eligible for such a modification.

### Statebridge had a Duty of Care to Mrs. Fox Once It Undertook to Offer Her Loss Mitigation Assistance

111.    Statebridge owed Mrs. Fox a duty of care because an intimate nexus existed between the parties based on a contract, or its privity equivalent. Statebridge had a duty to Mrs. Fox to (i) timely and accurately communicate the existence, availability, eligibility criteria, and the results of its evaluation of Mrs. Fox for loss mitigation options; and (ii) timely and accurately evaluate Mrs. Fox for loss mitigation options including through and by utilizing the correct numerical inputs and results thereof.

112.    Statebridge also owed a duty of care to Mrs. Fox as to the Real Estate Settlement Procedures Act ("RESPA") and its enforcing regulation, Regulation X, 12 C.F.R. § 1024.01 *et seq.*, under which a servicer must maintain policies and procedures that are reasonably designed to provide timely and accurate information to borrowers, and properly evaluate loss mitigation applications. 12 C.F.R. § 1024.38(b)(1)-(2).

113.    Unlike the relationship between a bank or lender and a borrower, the relationship between a borrower and a servicer is not a typical arm's length transaction. Mrs. Fox did not choose

to have Statebridge service her Loan, and she did not have the option of moving the servicing of her Loan to another servicer when problems arose. Even if Mrs. Fox refinanced the Loan entirely, there is nothing preventing the lender from contracting with Statebridge to service the new loan.

114.    Mrs. Fox was completely dependent upon Statebridge for information regarding her Loan, and the availability and her eligibility for a loss mitigation option. Statebridge knew that she was relying upon the information provided to her by it including whether she could be reviewed for a repayment plan or loan modification without BRP, and the TPP Payment amount under the TPP Notice. Statebridge stated in the TPP Notice "Based on a careful review of your mortgage account, we are offering you an opportunity to enter a Trial Period Plan for a mortgage modification." Statebridge knew that failing to properly conduct the loss mitigation process could result in a foreclosure or other irreparable harm.

115.    Statebridge had extensive control over the loss mitigation process including whether Mrs. Fox's Loan was reviewed and ultimately approved for a repayment plan or loan modification. No other entity, including Freddie Mac, was in possession of the numerical inputs regarding the Loan that were required to be reviewed to determine whether Mrs. Fox should have been reviewed, offered, or approved for a loss mitigation option. No other entity had the authority to review or approve the Loan for a loss mitigation option. Statebridge exercised this authority when it chose not to inform Mrs. Fox of the existence of a repayment plan, or review or approve Mrs. Fox for a repayment plan or loan modification without a BRP. Statebridge exercised this authority when it offered Mrs. Fox the opportunity to enter into a trial period plan but offered Mrs. Fox a TPP Payment amount that would have resulted in Mrs. Fox paying substantially more than she owed, and refused to reexamine or explain the increase.

116.     Mrs. Fox, in morals and good conscience, had the right to rely upon the statements and actions of Statebridge as they relate to the servicing of her mortgage and loss mitigation. Every month, Statebridge sent Mrs. Fox statements telling her how much to pay including for escrow payments. Mrs. Fox in turn sent her mortgage payment to Statebridge and relied upon it to properly apply it to her Loan account, and make escrow payments as necessary. Statebridge repeatedly told Mrs. Fox that it would review her loss mitigation, and Statebridge did eventually offer Mrs. Fox the opportunity to enter into a trial period plan.

117.     Mrs. Fox is particularly vulnerable as an unsophisticated, borrower who was behind on her mortgage. Mrs. Fox was relying on Statebridge to exercise reasonable care and utilize its superior knowledge, skill, and experience when interpreting and implementing the loss mitigation programs available to Mrs. Fox. Statebridge held itself out as being capable of properly implementing the loss mitigation policies and procedures.

**COVID-19 Pandemic**

118.     In February and March 2020, the United States and the rest of the world were hit by the COVID-19 pandemic. As a result of the shutdown of the entire U.S. economy, Freddie Mac and other government agencies dealing with mortgage lending and servicing implemented a broad program of forbearances and other loss mitigation options to aid borrowers who had been impacted by the crisis, and thus avoid foreclosure.

119.     Mrs. Fox was impacted by the crisis and would have been unable to make her monthly payments during this period. She was placed in a COVID-19 Forbearance Plan.

120.     Relevant for this Complaint, Freddie Mac implemented a COVID-19 Payment Deferral option wherein an eligible borrower could defer payments for up to 18 months as a non-interest-bearing balance and simply reinstate their normal payments at the end of the deferral. There was no loan modification application or review. The deferred payments would be added to

the end of the loan and all other terms would remain the same. However, to be eligible, a borrower had to be less than two months delinquent as of March 1, 2020.

121.    Because Statebridge violated the terms of the Servicing Guide and failed to place Mrs. Fox into a repayment plan, or offer her a proper Streamlined Flex Modification as described above, Mrs. Fox's Loan was considered delinquent more than two months on March 1, 2020. As such, Mrs. Fox is ineligible for the COVID-19 Payment Deferral option for which she otherwise would have been eligible.

122.    In addition, on January 7, 2021 and May 13, 2021, Community reviewed Mrs. Fox for additional loss mitigation options including a Streamlined Flex Modification and denied her for any option that would allow her to retain the house. Ex. 12, Community Denial Letters. While the letter does not state the reason for the denial, upon information and belief, Mrs. Fox believes that she does not qualify because a proposed modification in compliance with the Servicing Guide requirements would not result in a decreased P&I Payment. As such, Statebridge's errors robbed Mrs. Fox of the ability to save her home once again.

123.    On May 16, 2022, Community transferred the servicing of the Loan to Nationstar Mortgage d/b/a RightPath Servicing. RightPath stated in a letter that it was servicing the Loan on behalf of "FHLMC VPC INTERIM SVCG • A/A". Mrs. Fox is unsure at this time whether this means Freddie Mac has transferred the ownership of her Loan, and any possible ramifications of such a transfer.

**Mrs. Fox attempted to Fix the Errors with New Loan Servicer**

124.    After servicing was transferred to Community, the Loan remained in default due to Statebridge's errors.

125.     On or around April 30, 2021, Mrs. Fox through her counsel sent to Community a Notice of Error/Request for Information letter ("1st NOE") pursuant to RESPA, and Regulation X. 12 C.F.R. §§ 1024.35-1024.36. Ex. 13, 1st NOE.

126.     In the 1st NOE, Mrs. Fox explained in detail the servicing errors made by Statebridge which were being continued by Community including:

> (1) failing to provide Mrs. Fox with all loss mitigation options pursuant to 12 C.F.R. § 1024.39 including failing to approve her for a repayment plan in or around August and September 2018, which has resulted in the loan continuing to be considered in default (2) failing to make a decision on a completed loss mitigation application within 30 days in violation of 12 C.F.R § 1024.41; and (3) providing incorrect trial period payment amount in her approval letter for a Flex Streamlined Modification Trial Period Plan in May 2019 which has provided the loan from becoming current and will affect her ability to end a loan modification at the end of the Covid forbearance.

1st NOE, at 1.

127.     In a letter dated July 29, 2021, Community purported to respond to Mrs. Fox's notice of errors and request for information letters, but failed to fix the errors set out in the 1st NOE, conduct a reasonable investigation, or provide complete information or respond to all of the narrowly tailored requests including but not limited to:

a.     Failing to provide the numerical inputs used to evaluate Mrs. Fox eligibility for the modification;

b.     Failing to provide the principal, interest, taxes, and insurance payment amounts that made up the modified monthly payment amount in the TPP Payment of $1,669.70;

c.     Stating that Mrs. Fox "was reviewed for all available loss mitigation options at the time" without providing any supporting factual or documentary evidence to support such a claim and ignoring the obvious evidence that she was not timely offered a

Streamlined Flex Modification and then was offered a Streamlined Flex Modification with incorrect monthly payments;

d. Failing to correct the serving errors on her loan including that she was not offered the proper Streamlined Flex Modification and because of that, Community was seeking payment of an amount which was not due; and

e. Failing to provide all loan modification agreements.

### Mrs. Fox Has Suffered and Will Continue to Suffer Harm From Statebridge's Fraud, Errors, and Mistakes

128.    Mrs. Fox continues to face the threat of foreclosure and has incurred additional interest, attorney's fees, late fees, and other costs as a result of Statebridge's actions and Community's failure to remedy the errors. Mrs. Fox is likely no longer eligible for any Freddie Mac loan modification because of the actions of Statebridge. As of November 18, 2022, RightPath alleges that Mrs. Fox must pay $72,587.17 to reinstate her. Mrs. Fox has also suffered damage to her credit report as Community and RightPath continue to report derogatory information on her credit reports associated with the Loan.

129.    In addition, Mrs. Fox has suffered non-economic damages in the form of emotional distress that has resulted in the physical manifestation of that distress including, but not limited to: anxiety, stress, frustration, aggravation, loss of sleep, and the fear of losing the home that her daughter and grandchildren were living in. In addition, the threat of the wrongful foreclosure exuberated her daughter's mental health issues which increased Mrs. Fox's stress in interacting with her daughter. Mrs. Fox has sought mental health care as a result of the Defendants actions in this case.

**Statebridge have a History of Failing to Comply with Loss Mitigation Requirements and RESPA**

130.     In the CFPB Consumer Complaint database several consumers made complaints against Statebridge that are similar to the allegations by Mrs. Fox in this case. For example:

a.     Complaint ID 3829917 states:

We have tried to have the bank process a modification application for us, for over a year now! We have sent several applications, the last pa jags was sent off in XX/XX/2020. Since we sent off the modification application, we have not heard from the back, neither by letter nor phone calls. We have been calling at least Ive [sic] every week in the past month, and everytime [sic] we call, the automated system asked us to hold and that we will be answered in less than one minute. However the wait had been from 1-2 hrs and each time we have to hang up because no one answers the phone. So we do not know what is going on, nor the status of the modification application.

b.     Complaint ID 2899105 states:

A severe hardship forced us into foreclosure on our home loan with XXXX XXXX in XX/XX/XXXX. We were told we were approved for a Loan Modification by XXXX XXXX in XX/XX/XXXX, and as we moved forward with the process, our loan was transferred to Statebridge Company. We were told by XXXX XXXX  that this transfer would not jeopardize the Loan Modification process. They assured us that all of the paperwork would be transferred over to this new Servicer. We were asked to allow a few weeks for the paperwork to transfer over, and that the process should continue where they ( XXXX XXXX  ) left off. After receiving letters confirming the transfer of the mortgage to Statebridge Company, and waiting a few weeks as suggested, I ( XXXX XXXX ) called Statebridge Company to continue with the Loan Modification process, and to start back on making our mortgage payments. Things started out slowly with this company from the start, as I was put on hold multiple times only to receive the e-mail address of XXXX XXXX, whom I was told would be the person handling our Loan Modification. After e-mailing this person as instructed, she responded and referred me to another person, XXXX XXXX who would supposedly be the person handling our modification. It was mentioned in the email that he was out of the office, but for us to keep in mind again, it would take a couple of weeks for the paperwork to settle into their office. A couple of weeks went by and I followed up with an email to XXXX XXXX to no response. After a few days, I placed a call to Statebridge, this time asking to speak directly to XXXX XXXX. I was transferred to XXXX XXXX who seemed to know nothing about our Account, our Loan Modification or anything. He said he would look into everything and get back to me within a few days, of which I heard nothing. A week later, I sent a follow-up e-mail to the first person I was referred to, XXXX XXXX to no response. A couple of weeks went by and we were now towards the end of XX/XX/XXXX and I began to feel leery of this new Company

and its intentions. I placed another call to XXXX XXXX, who informed me that he had not received our Loan Modification packet, and that he would have to speak to the investors at his company about starting another one. He again stated that he would get back to me, of which he never did. I called again ( not sure of the date, but by this time we were in I believe the end of XXXX or the beginning of XX/XX/XXXX ). I spoke again to XXXX XXXX who still had no information, nor any options for us at that time. I asked to speak to someone else and was mysteriously disconnected. This happened on multiple occasions. In XX/XX/XXXX, we received a Sheriff Sale Date for our home. We immediately contacted a HUD Certified Counselor as  advised in the notification letter we received ; ( we had no prior knowledge of this office or this type of assistance ). It was at an appointment with our HUD Counselor, that she placed a call to Statebridge Company and identified who she was. It wasn't until then, XX/XX/XXXX, that she was immediately given instructions on how to download a Mortgage Assistance Application from the company 's website. We had never been offered this option prior. We were granted 2 adjournments on the Sheriff Sale, and during that time, completed and submitted the Mortgage Assistance Application that was downloaded from the Statebridge website, by our HUD Counselor. We submitted it via. email & fax on XX/XX/XXXX. It was immediately denied, claiming No Time to Evaluate, foreclosure sale is scheduled for XX/XX/XXXX. I immediately responded, informing that an adjournment was granted, extending the sale date to XX/XX/XXXX. They responded with : The letter still stand, there is not enough time to review. I now believe the sole intention of this company is to force the foreclosure and sale of our home, which is why they didn't offer us any assistance or options from the start. They would more than likely be the ones to purchase our home too, since it's worth over {$100000.00} more than what we owe on it. We moved on to pursue and received a Court Ordered Stay of the Sheriff sale until XX/XX/XXXX. During the Court session, the Statebridge Attorney, XXXX XXXX was conferenced in by telephone. He stated in Court that Statebridge had  been waiting for paperwork from us back in XX/XX/XXXX. My husband and I are totally un-aware of this request for paperwork and believe this statement to be totally untrue. We testified to this in court. The Judge has ordered for the Statebridge Attorney to receive the original loan modification from us and for him to submit it to the Statebridge Company. The paperwork was submitted to the Attorney via. Email on XX/XX/XXXX. XXXX XXXX asked that I follow up with him for an update the following week. I left to messages with XXXX XXXX this week and did not receive a return call. We are not sure of what to do at this time. We have been treated very unfairly since day one of the transfer of our loan to Statebridge Company. As shown in the Client Action Plan, drawn up by the HUD Counselor, we can clearly afford our house, and are not being given a fair chance to retain it. I've attached all  associated documents in order from the beginning of this ordeal. We look forward to hearing from someone soon. Thank You!

c.      Complaint ID 3312009 states:

I applied for a loan modification end of XX/XX/2019. I was informed via a letter that STATEBRIDGE had a complete package and in 30 days I would receive an answer. I did not receive ANY ANSWER from them.

Furthermore, I called on XX/XX/2019, I was told to send an email to loss mitigation. I sent the email and received no answer. On XX/XX/2019, I spoke to XXXX, still no information available to me, and no answer.

The woman who is working on my file is XXXX. She has put no notations on my file, so I can not obtain any information. Furthermore, XXXX says well your current on your mortgage. What difference does that make if I need assistance?

### COUNT I - VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT, MD. CODE ANN., COM. LAW § 13-101
### (MRS. FOX AGAINST STATEBRIDGE)

131.    Mrs. Fox reincorporates paragraphs 1-130 of this Complaint as though more fully set forth herein.

132.    The mortgage loan servicing and transactions of Statebridge, as set forth herein, are governed by the Consumer Protection Act, Md. Code Ann., Com. Law. § 13-101, *et. seq.*

133.    Mrs. Fox is a "consumer" as defined by § 13-101(c)(1)-(2) as she is the actual purchaser or recipient of consumer goods, services, realty, or credit as this dispute involves a loan on residential property that was purchased as Mrs. Fox's primary residence and wherein members of her family reside. In addition, Mr. Fox and Mrs. Fox took out the Loan primarily for personal reasons in that the money received from the refinance was used to pay off the debt for a home in which her family lived, and to pay purchase personal, household, and family items, and payoff debts.

134.    Statebridge is a "Merchant" as defined by C.L. § 13-101(g) as Statebridge directly or indirectly offers or makes available to consumers, consumer goods, services, realty, or credit as Statebridge is the servicer of residential mortgage loans.

36

135.    Section 13-303 prohibits unfair, abusive, or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The communications and servicing activities of Statebridge as set forth above in paragraphs 56-111 of this Complaint involve both the extension of credit and the collection of debts.

136.    Section 13-301 contains a non-exclusive list of unfair, abusive, or deceptive trade practices to include, *inter alia*, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive. C.L. § 13-101(1),(3). A trade practice is unfair if it "results in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have avoided." Mrs. Fox alleges that Statebridge engaged in the following unfair, abusive, or deceptive trade practices (among others):

a.    It failed to maintain policies, practices, and procedures to review borrowers for loss mitigation options in compliance with the Servicing Guide as described in this Complaint generally and this paragraph.

b.    In August 2018, Statebridge failed to inform her as to the existence of, review, or offer Mrs. Fox a repayment plan as required by the Freddie Mac's Servicing Guide when Mrs. Fox specifically requested such a plan. Instead, Statebridge misrepresented to Mrs. Fox that she had to submit a BRP in order to be reviewed for any loss mitigation loss. The misrepresentation and failure to state the material fact as to the existence of the repayment option and Mrs. Fox's eligibility for it were statements or omissions of material facts that deceived Mrs. Fox as to her

options to become current on her Loan and prevent foreclosure. Ms. Fox relied upon those misrepresentations and omissions, and was consequently harmed.

c.    Between the 90th and 105th day after the missed July 1, 2018 payment, Statebridge was required by the Freddie Mac Servicing Guide to evaluate Mrs. Fox for a Streamlined Flex Modification, and if eligible, solicit her with a TPP agreement.

d.    It was an unfair, abusive or deceptive trade practice to fail to evaluate Mrs. Fox for a Streamlined Flex Modification for which she qualified, fail to solicit her by mail or otherwise inform her that she qualified for the Streamlined Flex Modification as required by the Freddie Mac Servicing Guide, and fail to inform her of her right to be evaluated for Streamlined Flex Modification without submitting a BRP as described above. The misrepresentations and failure to state the material facts as to the existence of Mrs. Fox's eligibility for Streamlined Flex Modification were statements or omissions of material facts that deceived Mrs. Fox as to her options to become current on her Loan and prevent foreclosure. Mrs. Fox relied upon those misrepresentations and omissions, and was consequently harmed.

e.    Statebridge delayed reviewing Mrs. Fox for a Streamlined Flex Modification, falsely claiming that it did not receive her first BRP, and it could not review her for a loan modification without a completed BRP at a time when it knew that was untrue. Pursuant to the Servicing Guide, Statebridge was required to review her without the BRP. Statebridge's false statements and omissions harmed Mrs. Fox as it delayed her review for loss mitigation and likely cost her the opportunity to qualify for a loan modification.

f.    Statebridge failed to acknowledge Mrs. Fox's completed BRP within 5 days, and

review it within 30 days as Mrs. Fox's completed BRP was submitted no later than January 24, 2019. Statebridge did not acknowledge it until February 7, 2019, and did not review it and provide Mrs. Fox a decision until May 20, 2019.

g.   Statebridge failed to contact Mrs. Fox to ask her whether she wanted to pay the Projected Escrow Shortage off in a lumpsum, or spread it out over 60 months. Because it did not contact her, Statebridge was required to spread it out over 60 months, but it instead unilaterally chose to spread the payment out over only 12 months. To compound this error and violation of the *Workout Prospector Users' Guide* and Servicing Guide, Statebridge sent Mrs. Fox a Streamlined Flex Modification TPP agreement that contained an estimated modified monthly payment that contained the Projected Escrow Shortage payment amount without informing Mrs. Fox that it was the reason for the substantial increase in the payment and that such increase was temporary rather than for the remaining 40 years of the loan. Moreover, Statebridge refused to correct its mistake when questioned by Mrs. Fox, or explain that the payment increase was temporary, and instead falsely told her that the lender would not approve her for any additional modifications. Mrs. Fox relied upon the incorrectly calculated offered modified TPP payment and failure to correct it were relied upon, and caused Mrs. Fox to reject the TPP offer because she could not agree to a modification which she understood would have resulted her paying back substantially more money that she owed under the proposed terms without a proper explanation. Mrs. Fox has been harmed by Statebridge's conduct because the Loan remains marked as delinquent, she was unable to bring the Loan current, she faces foreclosure, she has incurred additional

late fees, attorneys' fees, and other charges, and she is likely ineligible for a loan modification.

h.    In response to Mrs. Fox's letters and complaints, Statebridge made several false statements including stating that Mrs. Fox was not eligible for a repayment plan because "she was well over 12 months in delinquency" when Mrs. Fox asserted, she requested a repayment plan in August of 2018 when she was only two months delinquent. Statebridge also concealed that it had violated the Servicing Guide by failing to offer her a repayment plan, failing to review her for a Streamlined Flex Modification 90 to 105 days after the missed July 1, 2018 payment with submitting a BRP, and failing to disclose that Mrs. Fox was eligible for the Streamlined Flex Modification.

i.    Statebridge failed to maintain contact with Mrs. Fox and return her phone calls and letters.

137.    By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, Statebridge has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act.

138.    Statebridge's conduct, misrepresentations, and omissions, as set forth above, had the capacity, tendency or effect of deceiving Mrs. Fox, who did rely on the misrepresentations and omissions of material fact, and who suffered economic and non-economic damages (including emotional distress and mental anguish as described in paragraph 117 of this Complaint).

139.    The practices that are described above are also unfair as Mrs. Fox suffered a substantial injury; her injury is not outweighed by any countervailing benefits to the consumer or

to competition that the practice produces; and she could not have reasonably avoided the injury.

140.    WHEREFORE, Mrs. Fox respectfully requests the Court enter judgment in her favor and against Statebridge and award her treble damages (including economic and non-economic) to be proven at trial in a sum in excess of $75,000; incidental and consequential damages; costs and attorney's fees incurred by Mrs. Fox; and grant Mrs. Fox such other and further relief as this Court finds necessary and proper.

### COUNT II – VIOLATIONS OF MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. CODE ANN., REAL PROP. § 7–401, *ET SEQ.* (MRS. FOX AGAINST STATEBRIDGE)

141.    Mrs. Fox reincorporates paragraphs 1-130 of this Complaint as though more fully set forth herein.

142.    The Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. § 7-401, *et. seq.,* governs the relationship between Statebridge and Mrs. Fox.

143.    Md. Code Ann., Real Prop. § 7-401(c) provides that "Homeowner" means a record owner of residential real property. Mrs. Fox is the record owner of the residential property in question and is, therefore, a Homeowner as understood in this statute.

144.    Md. Code Ann., Real Prop. § 7-401(e) provides that "Mortgage lending process... include[s] [t]he... of a mortgage loan."

145.    Md. Ann. Code, Fin. Inst. § 11-501(1) provides that "Mortgage loan' means any loan or other extension of credit that is: (i) secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) for personal household or family purposes, in any amount."

146.    The MMFPA works to protect the interests of all parties to mortgage transactions in Maryland from misstatements, misrepresentations, and omissions. In this instance, the MMFPA works to protect borrowers like the Mrs. Fox from servicing companies like Statebridge and ensure

a level, fair playing field between all borrowers and professionals.

147.    Md. Code Ann., Real Prop. § 7-401(d) provides:

"Mortgage fraud" means any action by a person made with the intent to defraud that involves:

1.    Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;

2.    Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

3.    Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section;

4.    Conspiring to violate any provisions of item (1), (2), or (3) of this section...

148.    Statebridge committed mortgage fraud as defined in Md. Code Ann., Real Prop. § 7-401(d) by knowingly making deliberate misstatements, misrepresentations, or omissions (including but not limited to those discussed in paragraphs 62-110 of this Complaint):

a.    In August 2018, Statebridge failed to inform Mrs. Fox as to the existence of, review her for, or offer her a repayment plan as required by the Freddie Mac's Servicing Guide when Mrs. Fox specifically requested such a plan. Instead, Statebridge misrepresented to Mrs. Fox that she had to submit a BRP in order to be reviewed for any loss mitigation loss. The misrepresentation and failure to state the material fact as to the existence of the repayment option and Mrs. Fox's eligibility for it were statements or omissions of material facts that deceived Mrs. Fox as to her

42

options to become current on her Loan and prevent foreclosure. Ms. Fox relied upon those misrepresentations and omissions, and was consequently harmed.

b.  Between the 90th and 105th day after the missed July 1, 2018 payment, Statebridge was required by the Servicing Guide to evaluate Mrs. Fox for a Streamlined Flex Modification, and if eligible, solicit her with a TPP agreement. Statebridge failed to evaluate Mrs. Fox for a Streamlined Flex Modification for which she qualified, failed to solicit her by mail as required by the Servicing Guide or otherwise state that she qualified for the Streamlined Flex Modification, and failed to inform her of her right to be evaluated for Streamlined Flex Modification without submitting a BRP as described above. Instead, Mrs. Fox was told she could only be reviewed if she submitted a BRP. The misrepresentations and failure to state the material facts as to the existence Mrs. Fox's eligibility for Streamlined Flex Modification were statements or omissions of material facts that deceived Mrs. Fox as to her options to become current on her Loan and prevent foreclosure. Mrs. Fox relied upon those misrepresentations and omissions, and was consequently harmed.

c.  Statebridge sent Mrs. Fox a Flex Modification TPP agreement that contained an estimated modified monthly payment which included the Projected Escrow Shortage amount spread out over 12 rather than 60 months. Moreover, Statebridge failed to disclose that the estimated modified monthly payment amount was temporary rather for the life of the loan. Statebridge refused to correct its mistake when questioned by Mrs. Fox, or provide her with the information that the payment amount was temporary, and instead falsely told her that the lender would not approve her for any additional modifications. The incorrectly calculated and offered

modified TPP payment and failure to correct it was relied upon by Mrs. Fox and caused her to reject the TPP offer because she could not agree to a modification which would have resulted in her paying back substantial money that she owed under the proposed terms. Mrs. Fox has been harmed by Statebridge's conduct because the loan remains marked as delinquent, she was unable to bring the loan current, she faces foreclosure, she has incurred additional late fees, attorney's fees, and other charges, and she is likely ineligible for a loan modification.

149.    All of the misstatements, misrepresentations, or omissions described herein were made with actual malice as Statebridge had the intent to deceive Mrs. Fox and it had actual knowledge of the falsity of its statements as it was in possession of all documents, facts, and the Servicing Guide. In the alternative, Statebridge intentionally refused to gain actual knowledge. Further, Statebridge actively suppressed and concealed the existence of the repayment plan, and Mrs. Fox's right to be reviewed for the loan modification without a BRP, diverting Mrs. Fox from otherwise discovering that she was entitled to both.

150.    Statebridge gained or attempted to gain in the following ways by misrepresenting and concealing the material facts described above:

a.    Statebridge practice of concealing the existence of a repayment plan and only reviewing Mrs. Fox, and other borrowers, for loss mitigation after receiving a BRP was designed to minimize its expenditures related to loss mitigation and maximize its profits. Statebridge was able to save money and resources because it did not have to develop policies and procedures, and train their employees when to deploy and how to implement different loss mitigation options. It did not have to develop the software or technology to perform different types of calculations or ensure that

loans were automatically reviewed for a streamline modification at the 90-day mark. Instead, it was able to only have to review borrowers for a modification after they submitted a BRP, thereby reducing the number of applications that it had to review, and resources it had to expend to do so.

b.    By concealing the existence of the repayment plan and pushing Ms. Fox to submit a BRP for a modification at a time she was not eligible to be reviewed, Statebridge gained the opportunity to receive a foreclosure alternative incentive that it would not have received if Mrs. Fox had entered the repayment plan when she was less than 60 days delinquent.

c.    Each month that Mrs. Fox's mortgage remained delinquent, Statebridge would receive additional compensation in the form of late fees or other ancillary fees that it would not have received if Mrs. Fox's Loan was entered into a repayment plan, or modified her Loan correctly.

d.    The TPP Payment in the TPP Notice to which Statebridge sought Mrs. Fox's agreement in May 2019 including additional missed monthly payments and costs that were capitalized into the unpaid principal balance as result of the delay stemming from the misrepresentations and concealment. Beyond that, Statebridge attempted to significantly increase Mrs. Fox's monthly payment to include the Projected Escrow Shortage spread out over 12 rather than 60 months so that it would be paid back faster even though it was not entitled to do so without Mrs. Fox's election.

e.    If Mrs. Fox's Property was sold at foreclosure sale, there was the possibility that Statebridge could repurchase REO property and then sell it at a profit.

151.     Mrs. Fox suffered economic and non-economic damages as a direct result of the reasonable reliance on Statebridge's false representations and omissions.

152.     Statebridge's actions constitute a violation of Md. Code Ann., Real Prop. § 7-402.

153.     WHEREFORE, Mrs. Fox respectfully requests the Court enter judgment in her favor and against Statebridge and award her treble damages (including economic and non-economic) to be proven at trial in a sum in excess of $75,000; punitive damages in an amount to be proven at trial; incidental and consequential damages; costs and attorney's fees incurred by Mrs. Fox; and grant Mrs. Fox such other and further relief as this court finds necessary and proper.

### COUNT III – FRAUD OR NEGLIGENT MISREPRESENTATION
### (MRS. FOX AGAINST STATEBRIDGE)

154.     Mrs. Fox reincorporates paragraphs 1-130 of this Complaint as though more fully set forth herein.

155.     Statebridge made false representations and intentional omissions of material fact as follows:

a.     In August 2018, Statebridge failed to inform Mrs. Fox as to the existence of, review her for, or offer her a repayment plan as required by the Freddie Mac's Servicing Guide when Mrs. Fox specifically requested such a plan. Instead, Statebridge misrepresented to Mrs. Fox that she had to submit a BRP in order to be reviewed for any loss mitigation loss. The misrepresentation and failure to state the material fact as to the existence of the repayment option and Mrs. Fox's eligibility for it were statements or omissions of material facts that deceived Mrs. Fox as to her options to become current on her Loan and prevent foreclosure. Ms. Fox relied upon those misrepresentations and omissions, and was consequently harmed.

b.     Between the 90th and 105th day after the missed July 1, 2018 payment, Statebridge

was required by the Servicing Guide to evaluate Mrs. Fox for a Streamlined Flex Modification, and if eligible, solicit her with a TPP agreement. Statebridge failed to evaluate Mrs. Fox for a Streamlined Flex Modification for which she qualified, failed to solicit her by mail as required by the Servicing Guide or otherwise state that she qualified for the Streamlined Flex Modification, and failed to inform her of her right to be evaluated for Streamlined Flex Modification without submitting a BRP as described above. Instead, Mrs. Fox was told she could only be reviewed if she submitted a BRP. The misrepresentations and failure to state the material facts as to the existence Mrs. Fox's eligibility for Streamlined Flex Modification were statements or omissions of material facts that deceived Mrs. Fox as to her options to become current on her Loan and prevent foreclosure. Mrs. Fox relied upon those misrepresentations and omissions, and was consequently harmed.

c.   Statebridge sent Mrs. Fox a Flex Modification TPP agreement that contained an estimated modified monthly payment which included the Projected Escrow Shortage amount spread out over 12 rather than 60 months. Moreover, Statebridge failed to disclose that the estimated modified monthly payment amount was temporary rather for the life of the loan. Statebridge refused to correct its mistake when questioned by Mrs. Fox, or provide her with the information that the payment amount was temporary, and instead falsely told her that the lender would not approve her for any additional modifications. The incorrectly calculated and offered modified TPP payment and failure to correct it was relied upon by Mrs. Fox and caused her to reject the TPP offer because she could not agree to a modification which would have resulted in her paying back substantial money that she owed

under the proposed terms. Mrs. Fox has been harmed by Statebridge's conduct because the loan remains marked as delinquent, she was unable to bring the loan current, she faces foreclosure, she has incurred additional late fees, attorney's fees, and other charges, and she is likely ineligible for a loan modification.

156.    All of the misstatements, misrepresentations, or omissions described herein were made with actual malice as Statebridge had the intent to deceive Mrs. Fox and it had actual knowledge of the falsity of its statements, or intentionally refused to gain actual knowledge, as it was in possession of all documents, facts, and the Servicing Guide. Further, Statebridge actively suppressed and concealed the existence of the repayment plan, and Mrs. Fox's right to be reviewed for the loan modification without a BRP, and this diverted Mrs. Fox from otherwise discovering that she was entitled to both.

157.    Statebridge gained or attempted to gain in the following ways by misrepresenting and concealing the material facts described above:

a.    Statebridge practice of concealing the existence of a repayment plan and only reviewing Mrs. Fox, and other borrowers, for loss mitigation after receiving a BRP was designed to minimize its expenditures related to loss mitigation and maximize its profits. Statebridge was able to save money and resources because it did not have to develop policies and procedures, and train their employees when to deploy and how to implement different loss mitigation options. It did not have to develop the software or technology to perform different types of calculations, or ensure that loans were automatically reviewed for a streamline modification at the 90-day mark. Instead, it was able to only have to review borrowers for a modification after they submitted a BRP, thereby reducing the number of applications that it had to

review, and resources it had to expend to do so.

b.      By concealing the existence of the repayment plan and pushing Ms. Fox to submit a BRP for a modification at a time she was not eligible to be reviewed, Statebridge gained the opportunity to receive a foreclosure alternative incentive that it would not have received if Mrs. Fox had entered the repayment plan when she was less than 60 days delinquent.

c.      Each month that Mrs. Fox's mortgage remained delinquent, Statebridge would receive additional compensation in the form of late fees or other ancillary fees that it would not have received if Mrs. Fox's Loan was entered into a repayment plan, or modified her Loan correctly.

d.      The TPP Payment in the TPP Notice to which Statebridge sought Mrs. Fox's agreement in May 2019 including additional missed monthly payments and costs that were capitalized into the unpaid principal balance as result of the delay stemming from the misrepresentations and concealment. Beyond that Statebridge attempted to significantly increase Mrs. Fox's monthly P&I payment above what was owed. If Mrs. Fox would have agreed to the modification offer, Statebridge's Servicer Fee would have been significantly increased.

e.      If Mrs. Fox's Property was sold at foreclosure sale, there was the possibility that Statebridge could repurchase REO property and then sell it at a profit.

158.    Mrs. Fox suffered economic and non-economic damages as a direct result of the reasonable reliance on Statebridge's false representations and omissions.

159.    In the alternative, Statebridge is liable for negligent misrepresentation even if its misrepresentations were not intentional. Statebridge owed Mrs. Fox a duty of care as described in paragraphs 111-117.

160.    WHEREFORE, Mrs. Fox respectfully requests the Court enter judgment in her favor and against Statebridge and award her actual damages (including economic and non-economic) to be proven at trial in a sum in excess of $75,000; punitive damages in the amount to be proven at trial; incidental and consequential damages; costs and attorney's fees incurred by Mrs. Fox; and grant Mrs. Fox such other and further relief as this court finds necessary and proper.

### COUNT V – BREACH OF CONTRACT
### (MRS. FOX AGAINST STATEBRIDGE)

161.    Mrs. Fox reincorporates paragraphs 1-130 of this Complaint as though more fully set forth herein.

162.    The Note and Deed of Trust constitute a binding and enforceable contract. Exs. 1-2.

163.    Maryland law recognizes an implied duty of good faith and fair dealing as applied to the "performance and enforcement" of the contract itself.

164.    If Statebridge purchased the servicing rights and/or took assignment of those servicing obligations under the Mortgage or Deed of Trust, Statebridge is in privity with Mrs. Fox.

165.    If Statebridge services the Loan as an agent for the Freddie Mac, Statebridge is in functional privity or near privity of contract with Mrs. Fox as a result of its fulfillment of its principal's duties and obligations running from the Note and Deed of Trust, including but not limited to: (i) the collection of all monies due under the Loan; (ii) preparing and transmitting monthly statements concerning the Loan; (iii) performing all or nearly all customer service functions concerning the Loan; (iv) engaging in written and oral communications concerning the

Loan; (v) enforcing its principal's rights of foreclosure under the loan agreements; and (vi) timely providing Mrs. Fox with accurate information regarding her loss mitigation options and to properly evaluate her for them.

166.    As Statebridge is in privity or the privity equivalent with Mrs. Fox Note and Deed of Trust, Statebridge has the implied duty of good faith and fair dealing.

167.    Section 19 and Section 22 of the Deed of Trust deal with acceleration, default, and the borrower's right to reinstate after acceleration. *See* Ex. 1. Specifically, Mrs. Fox has the right to reinstate the loan until the earlier of five days before the sale or as prescribed by applicable law. *Id.* § 19.

168.    A repayment plan and loan modification are methods of reinstating the loan and curing the default. As discussed above, Mrs. Fox was eligible for both of these options which would have cured the default and allowed her to continue to make her monthly payments, but Statebridge in bad faith refused to review her for or offer these options. This is a breach of the implied covenant of good faith and fair dealing as Statebridge's actions have prohibited Mrs. Fox from performing her obligations under the contract; to wit, reinstating the loan and making timely payments.

169.    In addition, Section 20 of the Deed of Trust states:

"Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be

transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

170.   The Deed of Trust defines the applicable law as "all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. 2, DOT, DOT DEFINITIONS (I).

171.   Applicable law includes RESPA and Regulation X as a federal law and federal regulation that are applicable to Mrs. Fox's Loan.

172.   Pursuant to RESPA and Regulation X, a servicer must maintain policies and procedures that are reasonably designed to provide timely and accurate information to borrowers, and properly evaluate loss mitigation applications. 12 C.F.R. § 1024.38(b)(1)-(2).[41] As such,

---

[41] This includes, but is not limited to that the servicer:

(i) Provide accurate information regarding loss mitigation options available to a borrower from the owner or assignee of the borrower's mortgage loan;
(ii) Identify with specificity all loss mitigation options for which borrowers may be eligible pursuant to any requirements established by an owner or assignee of the borrower's mortgage loan;
(iii) Provide prompt access to all documents and information submitted by a borrower in connection with a loss mitigation option to servicer personnel that are assigned to assist the borrower pursuant to § 1024.40;
(iv) Identify documents and information that a borrower is required to submit to complete a loss mitigation application and facilitate compliance with the notice required pursuant to § 1024.41(b)(2)(i)(B); and
(v) Properly evaluate a borrower who submits an application for a loss mitigation option for all loss mitigation options for which the borrower may be eligible pursuant to any requirements established by the owner or assignee of the borrower's mortgage loan and, where applicable, in accordance with the requirements of § 1024.41.

12 C.F.R. § 1024.38(b)(i)-(iv)

Statebridge was contractually obligated to service the Loan in compliance with RESPA and Regulation X.

173.    Statebridge also breached Section 20, as it failed to carry out its servicer obligations in compliance with Applicable Law. Statebridge did not maintain proper policies and procedures reasonably designed to provide timely and accurate information and properly evaluate loss mitigation applications as it failed to provide either to Mrs. Fox, and upon investigation and belief, to other borrowers.

174.    Statebridge's breach of contract and breach of duty faith and fair dealing has resulted in significant damage to Mrs. Fox in the form of increased interest charges, threats of foreclosure, loss of the availability to receive certain loss mitigation benefits and protections, and attorneys' fees.

175.    WHEREFORE, Mrs. Fox respectfully requests the Court enter judgment in her favor and against Freddie Mac for actual non-duplicative damages to be proven at trial in a sum in excess of $75,000; consequential, and incidental damages as allowed by law; and grant Mrs. Fox such other and further relief as this Court finds necessary and proper.

### COUNT VI – NEGLIGENCE
### (MRS. FOX AGAINST STATEBRIDGE)

176.    Mrs. Fox reincorporates paragraphs 1-130 of this Complaint as though more fully set forth herein.

177.    Statebridge owed Mrs. Fox a duty of care as described in paragraphs 111-117.

178.    Statebridge breached its duty of care as follows:

a.      Statebridge failed to inform Mrs. Fox in or around August 2018 as to the existence of, review, or offer Mrs. Fox a repayment plan as required by the Servicing Guide when Mrs. Fox specifically requested such a plan.

b.     Between the 90th and 105th day after the missed July 1, 2018 payment, Statebridge was required by the Servicing Guide to evaluate Mrs. Fox for a Streamlined Flex Modification, and if eligible, solicit her with a TPP agreement.

c.     Statebridge delayed reviewing Mrs. Fox for a Streamlined Flex Modification falsely claiming that it did not receive her first BRP, and it could not review her for a loan modification without a completed BRP at a time when it knew that was untrue.

d.     Statebridge sent Mrs. Fox a TPP Notice without contacting her to determine whether she wanted to pay the projected escrow balance off in a lumpsum, or spread it out over up to 60 months. Without contacting her, Statebridge unilaterally decided to spread the amount out over only 12 months which significantly increased Mrs. Fox estimated modified monthly payment. Statebridge then sent Mrs. Fox the TPP offer without any indication that the estimated monthly payment would have been only for 12 payments rather than the life of the loan. When Mrs. Fox contacted Statebridge regarding the payment amount, it failed to provide her with the reason for the increase or tell her that the increase was temporary.

179.     Mrs. Fox is particularly vulnerable as an unsophisticated, borrower who was behind on her mortgage. Mrs. Fox was relying on Statebridge to exercise reasonable care and utilize its superior knowledge, skill, and experience when interpreting and implementing the loss mitigation programs available to Mrs. Fox.

180.     As a direct or proximate result of Statebridge's tortious conduct, Mrs. Fox suffered and will suffer economic and non-economic damages, including emotional distress such as anxiety and depression directly connected to the real threat of losing Plaintiff's home.

181.    WHEREFORE, Mrs. Fox respectfully requests the Court enter judgment in her

favor and against Statebridge for actual non-duplicative damages (including economic and non-

economic) to be proven at trial in a sum in excess of $75,000; and grant Mrs. Fox such other and

further relief as this Court finds necessary and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: June 19, 2023                        Respectfully Submitted,


                                            */s/ F. Peter Silva II*
                                            F. Peter Silva II, Esq. (MD Bar No. 19464)
                                            **TYCKO & ZAVAREEI LLP**
                                            2000 Pennsylvania Avenue NW, Suite 1010
                                            Washington, DC 20036
                                            Tel: (202) 973-0900
                                            Fax: (202) 973-0950
                                            psilva@tzlegal.com

                                            *Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 19, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and that a Notice of Electronic Filing was subsequently served upon all counsel of record.

*/s/ F. Peter Silva II*
F. Peter Silva II, Esq
